**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONDRETTA STRONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COWORX STAFFING SERVICES, LLC, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

### INTRODUCTION

1.      Plaintiff brings claims for discrimination in employment based on race, brought pursuant to Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000(e)(5) ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

### JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over plaintiff's claims pursuant to the provisions of 42 U.S.C. § 2000(e), *et. seq.*, and 28 U.S.C. § 1331.

3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) because (1) defendant Coworx Staffing Services, LLC ("Coworx" or "defendant"), is a resident of the Northern District of Illinois, and (2) all relevant events occurred in the Northern District of Illinois.

### PARTIES

4.      Plaintiff Dondretta Strong ("Ms. Strong" or "plaintiff") is African-American.  She resides in Bolingbrook, Illinois.  She was employed by defendant Coworx for two years, from May, 2013, until she was constructively discharged in May, 2015.  Coworx hired

plaintiff full-time as an "Account Manager" to handle the paperwork and interview process for job applicants whom Coworx recruited. Plaintiff performed marketing tasks, recruiting tasks, and account management for defendant.

5. Defendant Coworx is a staffing agency with offices in several states. Coworx's corporate headquarters are located in Watchung, New Jersey. On information and belief, Coworx has more than 500 employees. Plaintiff worked at defendant's location at 440 West Boughton Road, Bolingbrook, Illinois. During plaintiff's employment, defendant's Bolingbrook office consisted of approximately 40 full-time employees, all of whom were Caucasian, except for plaintiff.

## EEOC PROCEEDINGS

6. Plaintiff filed a timely charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a right-to-sue letter from the EEOC on or about December 11, 2015, and filed this lawsuit within the statutory time limit.

## FACTS RELATING TO ALL COUNTS

7. Plaintiff was an exceptional employee at Coworx. Her performance reviews were exemplary, and she was friendly and cordial with all of her co-workers and supervisors.

8. When Coworx first hired plaintiff in or about May, 2013, almost all of her account management duties were carried out from the Bolingbrook office; her marketing tasks were carried out in the local Bolingbrook area.

9. Plaintiff's direct supervisor (and the top person at Coworx's Bolingbrook office) was the Director of Sales and Operations, Sandy Picciola ("Ms. Picciola"). When she

2

hired plaintiff, Ms. Picciola assured her that she would be stationed in the local Bolingbrook area.

### Coworx Gives Plaintiff a Job Assignment Because of Her Race

10.     In or about September, 2014, Ms. Picciola assigned plaintiff to handle the "Sony account." On information and belief, this account required Coworx to recruit minimum-wage workers for industrial jobs located at Sony's local factory. The positions included assembly workers, warehouse workers, packers and forklift drivers.

11.     Ms. Picciola ordered plaintiff to focus her recruiting efforts on what she called "urban neighborhoods," which she specifically defined as the following areas: Chicago's Englewood neighborhood and the nearby south and west suburbs of Harvey, Chicago Heights and Cicero (collectively "urban neighborhoods"). Ms. Picciola used this euphemism to describe poor, African-American, high-violence, high-crime areas. All of these areas were outside of the Bolingbrook area.

12.     On information and belief, Ms. Picciola ordered plaintiff to recruit workers from these predominantly African-American neighborhoods because plaintiff herself was black, she held stereotypes about plaintiff, and she was unwilling to assign any of the white account managers to do the same work. Ms. Picciola instructed plaintiff to recruit employees from unemployment offices, homeless shelters, community centers and churches in these "urban neighborhoods."

13.     Plaintiff followed Ms. Picciola's direct orders to recruit in these areas because she feared she would lose her job if she refused to do so, but she specifically requested, from the very first assignment, that the Sony account and recruitment in these areas not become her permanent responsibility. Ms. Picciola assured plaintiff they would not.

14. As they continued to assign plaintiff recruiting tasks in "urban neighborhoods," Ms. Picciola and another supervisor, Pam Waring ("Ms. Warring"), repeatedly told plaintiff, in unmistakable allusions to her race, that they were sending her to recruit in these areas because "I know *you* know how to do it." They would remark: "we need *you* there" and "this needs to get done." Ms. Picciola and Ms. Waring are both white, as were all of plaintiff's supervisors and full-time co-workers at Coworx.

15. Ms. Waring also told plaintiff that these places were "in [plaintiff's] circle" and urged her to "use [her] contacts to get this done." In fact, plaintiff had no connection whatsoever to any of these areas. She never lived, worked, or studied in these areas. Plaintiff grew up in Alabama and lived on the Northside of Chicago for 8-9 years before moving to Bolingbrook, a western suburb of Chicago. She had no family, colleagues, or friends who lived in these areas.

16. On information and belief, Ms. Waring and Ms. Picciola sent plaintiff to these predominantly African-American areas assuming that plaintiff, who is black herself, could "get the job done" with her "own people," i.e., other African-Americans.

17. When Ms. Waring would tell her to "get this done," plaintiff would ask, "how would I know how to do that?" Ms. Waring never explained, other than to allude obliquely to plaintiff being especially appropriate for recruiting in these areas.

18. Plaintiff felt singled out due to her race and understood Ms. Waring and Ms. Picciola's repeated, unfounded remarks of "I know *you* know how to do it," "we need *you* there," and directives to "use [her] contacts/circle to get this done" as racial remarks directing her to "use her blackness" to recruit black job applicants.

19.     Despite Ms. Picciola's assurances that recruiting in the "urban neighborhoods" would not become plaintiff's permanent position, Ms. Waring and Ms. Picciola sent plaintiff to these same neighborhoods 2-3 times a week for a period of approximately eight months; they did so continuously until plaintiff resigned, despite plaintiff's constant complaints about her personal physical safety and her requests that other account managers take her place. Plaintiff was forced to recruit from these unsafe "urban neighborhoods" approximately 96 separate times.

20.     Coworx sent plaintiff to recruit *solely* in African-American, high-crime, high-violence neighborhoods.  Coworx never sent plaintiff to recruit in other areas.  Coworx sent its other Account Managers, who were all white, to recruit in other, mostly white, areas that had little-to-no crime or violence.

### *Coworx Knows that Plaintiff's Job Assignment,*
### *Which it Made on the Basis of Race, is Dangerous*

21.     Plaintiff found that the "urban neighborhoods" which Ms. Waring and Ms. Picciola sent her to were extremely dangerous.  From the very beginning of this assignment, plaintiff, who had *not* been hired by Coworx to do field recruiting, was put in life-threatening situations nearly every time she was sent to these neighborhoods.

22.     Plaintiff regularly heard gunshots in the streets when recruiting from the "urban neighborhoods."  As detailed below, Ms. Waring and Ms. Picciola sent plaintiff to high-violence areas saturated with gun violence on a regular basis (i.e., 2-3 times per week) for eight months, despite the fact that plaintiff complained about her safety each and every time she was sent to recruit in these areas.

23.     The following examples are illustrative, but not exhaustive, of the dangerous situations that Coworx forced plaintiff to endure, even after she repeatedly complained and requested reassignment.

24.     On or about November 19, 2014, Coworx sent plaintiff to the Englewood Goodwill Workforce Connection Center, located at 6054 South Western Avenue in Chicago to recruit workers for the Sony account.  While she was there, a male job applicant who was obviously under the influence of drugs snuck past security after his application was rejected because he failed Coworx's mandatory drug test.  Plaintiff calmly informed the man that she could not recruit him for a job because he failed the drug test.

25.     Angry and intoxicated, the man yelled profanities at plaintiff, called her a "dumb bitch" and threatened to physically harm and kill her.  He physically lunged at plaintiff, and a security guard intervened and forcibly removed him from the Center.

26.     On this and many other occasions when Coworx sent her to "urban neighborhoods," plaintiff feared for her life.  The places where Coworx sent plaintiff to recruit for Sony were almost always populated by intoxicated and violent individuals.

27.     Plaintiff complained to Ms. Picciola and Ms. Waring about the November 19, 2014 incident and explained what had happened to her that day in detail.  She told them that she feared for her life, explained why, and requested reassignment.  Ms. Waring and Ms. Picciola ignored plaintiff's complaints.  They did not reassign plaintiff.

28.     On or about January 27, 2015, plaintiff and her co-worker Christina Villarreal (a temporary worker) were assigned to recruit at the Englewood Goodwill Workforce Connection Center.

6

29.     After they finished for the day, Ms. Picciola required them to post job recruiting signs for Coworx in the surrounding streets, a dangerous task that Coworx often required plaintiff to do after she had spent the day recruiting in "urban neighborhoods."

30.     When plaintiff and Christina finished placing signs in the area, they stopped by a nearby McDonald's at 6355 South Martin Luther King Drive in Chicago in order to use the restaurant's WiFi Internet to complete some Coworx paperwork before dropping off the same at the Bolingbrook office.  Coworx required plaintiff to complete the paperwork on the same day she completed any recruiting assignment and to drop the paperwork off to the Bolingbrook office after it was complete.

31.     After they sat down, plaintiff noticed that one of the restaurant's windows had been shattered with a bullet.  Plaintiff and Christina looked around and noticed armed police in and around the McDonald's.  When they realized that someone had shot at the McDonald's window earlier in the day, they immediately left the restaurant.  On information and belief, a female McDonald's employee was shot in the face in the restaurant shortly before plaintiff and Christina arrived.

32.     Plaintiff complained to Ms. Picciola and Ms. Waring about the January 27, 2015 incident and explained how scared she was when she realized that someone had shot up the McDonald's.  She again told them that she feared for her life, explained why, and requested reassignment.  Ms. Waring and Ms. Picciola ignored plaintiff's complaints and continued to send her to recruit in Englewood.  They did not reassign plaintiff.

33.     Coworx also repeatedly sent plaintiff to the Illinois Department of Employment Security ("IDES") located at 16845 Halsted Street in Harvey to recruit workers for the Sony account.  The Harvey IDES was in such a dangerous area that the security guards

7

stationed there would often escort plaintiff from her car in the parking lot to the front door of the facility. Plaintiff feared for her life and safety each and every time she was sent to Harvey IDES.

34. For example, on March 12, 2015, when Coworx sent plaintiff to the Harvey IDES to recruit for Sony, plaintiff observed two women, potential recruits of hers, physically fighting each other in the lobby of the Harvey IDES. The two women began to throw chairs at each other. Plaintiff, who was approximately eight feet away, had to duck and take cover underneath a desk in order to avoid getting hit by the chairs.

35. The two women had been waiting to speak to plaintiff about potential jobs. It took security guards more than fifteen minutes to remove the obviously unstable and violent women from the building; in the meantime, they continued to be boisterous and physically violent. Plaintiff was in direct view of these women and could have been severely injured by a thrown chair.

36. Plaintiff complained to Ms. Picciola and Ms. Waring about the March 12, 2015 incident and explained what had happened to her that day in detail. She again told them that she feared for her life, explained why, and requested reassignment. Ms. Waring and Ms. Picciola ignored plaintiff's complaints. They did not reassign plaintiff.

37. On or about March 26, 2015, as plaintiff was interviewing recruits at Harvey IDES, a man and a woman were shouting profanities at each other in the next room. They were yelling so loudly that plaintiff could hear them, and it disrupted her interviews. On information and belief, the two were intoxicated. The man and the woman, whose yelling soon escalated to physical violence, had to be physically removed by a security guard.

38. Plaintiff complained to Ms. Picciola and Ms. Waring about the March 26, 2015 incident and explained what had happened to her that day in detail. She told them that she

feared for her life, explained why, and requested reassignment. Ms. Waring and Ms. Picciola ignored plaintiff's complaints. They did not reassign plaintiff.

39. On or about May 13, 2015, when plaintiff was again at Harvey IDES, a male potential recruit was seated and waiting to be interviewed. When plaintiff approached him and requested that he fill out a written application (the first step in the recruiting process), he stood up, stuck his face in plaintiff's face and began to yell at plaintiff, "you bitch, I'm not going to fill our this fucking application; you're not going to hire me anyway!" The man then pushed the desk plaintiff had been seated at and became physically violent. Plaintiff's co-worker, Christina, called the security guard, who then physically removed the man from the premises.

40. Coworx rarely sent another Coworx staff person with plaintiff when it sent her to recruit in dangerous areas. Coincidentally, Christina was working with plaintiff on May 13, 2015. The security guard was not in plaintiff's plain sight when the man became violent, and plaintiff could have been seriously harmed had Christina not promptly alerted the guard.

41. Plaintiff complained to Ms. Picciola and Ms. Waring about the May 13, 2015 incident and explained what had happened to her that day in detail. She told them that she feared for her life, explained why, and requested reassignment. Ms. Waring and Ms. Picciola ignored plaintiff's complaints. They did not reassign plaintiff.

42. In the spring of 2015, despite her numerous pleas and protests, Coworx sent plaintiff to recruit in Englewood just days after a major gang-shooting had occurred. Multiple people had been murdered and the shooting was widely publicized on the local news. Plaintiff knew about the shooting, told Ms. Waring and Ms. Picciola about it, and begged them not to jeopardize her physical safety by sending her to Englewood so soon after the shooting occurred. Ms. Waring and Ms. Picciola disregarded plaintiff's pleas and sent her to recruit in

Englewood (and place signs in the streets) just days after multiple people had been murdered in the same area.

43.     Nearly every time plaintiff was sent to recruit in "urban neighborhoods," Ms. Picciola and/or Ms. Waring would instruct her to place recruiting signs on the streets and street corners in the surrounding areas.  This extremely dangerous task required plaintiff to get out of her car, often after dark, in areas with a very high incidence of gang-related violence and crime.

44.     Plaintiff, who is a petite, well-dressed woman, stuck out like a sore thumb in these areas.  She often worried that she would be physically assaulted, robbed or both.

45.     While placing the signs in these areas, plaintiff often saw people walking or running with weapons in their hands, including guns.  Plaintiff often heard gunshots at all times of the day, including in the morning, in the "urban neighborhoods."  Plaintiff also saw people buy and sell drugs in plain view.  Plaintiff rarely saw police officers patrolling in these areas.

46.     Plaintiff feared for her life and safety each and every time Coworx required her to place signs on the streets and street corners in these areas; she had to do so more than 60 times.

47.     Plaintiff complained to Ms. Picciola and Ms. Waring each and every time they instructed her to place recruiting signs on the streets and street corners in the "urban neighborhoods."  She told them that she feared for her life, explained why, and requested reassignment.  Ms. Waring and Ms. Picciola ignored plaintiff's complaints.  They did not reassign plaintiff or relieve her from placing recruiting signs.

48.     Plaintiff was the only full-time Coworx employee who was ever sent to recruit or place signs in these "urban neighborhoods."  Her white co-workers were *never* sent to recruit in these areas.  She had no co-workers of color, except for Christina, who was Latina and a temporary (not a full-time) worker and who was assigned to recruit with plaintiff in dangerous areas only a few times (i.e., 3-4 times out of about 96 total times).

49.     Plaintiff's supervisors, who were all white, sent white employees to recruit for higher-wage jobs in much safer areas, including areas on the north side of Chicago.

50.     On information and belief, Ms. Waring and Ms. Picciola sent plaintiff and *only* plaintiff to recruit in the poor, predominantly African-American and dangerous neighborhoods and suburbs for no other reason except that she was black, and the other account managers were white.

**Plaintiff Repeatedly Complained To Her Supervisors To No Avail;**
**Coworx Never Sent White Account Managers to Recruit In "Urban Neighborhoods"**

51.     Week after week, plaintiff repeatedly and consistently complained to Ms. Waring and/or Ms. Picciola about how unsafe she felt when recruiting in the "urban neighborhoods."  She did so each and every time she came back from recruiting in these unsafe neighborhoods.

52.     After a day of recruiting, plaintiff would leave Ms. Waring and/or Ms. Picciola voicemails or emails summarizing her day of recruiting, including the fact that she felt unsafe, and what had happened to make her feel unsafe.  The next morning in the office, plaintiff would also follow-up with Ms. Picciola and/or Ms. Waring orally about how she felt unsafe in these neighborhoods.

53.     Plaintiff regularly explained to Ms. Waring and Ms. Picciola that the security provided in these locations was not sufficient for the number of potential recruits.

Numerous times, she explained that she lived in constant fear for her life, especially when she had to plant recruiting signs in the street, which was at least twice a week.

54.     On information and belief, Ms. Picciola and Ms. Waring never investigated plaintiff's complaints about her physical safety.  On information and belief, they never visited these high-crime, high-violence areas themselves or asked anyone else, besides plaintiff, to do so.

55.     Ms. Waring and Ms. Picciola also made no efforts to help plaintiff feel safe or to keep her safe.  Plaintiff implored Ms. Waring and Ms. Picciola to send a second person with her in order to increase her safety; however, apart from the 3-4 times when Coworx sent Christina, plaintiff was always sent alone.

56.     Plaintiff also begged Ms. Waring and Ms. Picciola to send *other* employees instead of her to cover some of the recruiting for Sony in the "urban neighborhoods." They always refused to do so.

57.     Plaintiff repeatedly told Ms. Picciola and Ms. Waring that it was not fair that she was the *only* one sent to these dangerous areas to conduct recruiting and that, while she was willing to do her part and recruit from these areas as often as others did, it was unreasonable for them to *only* send plaintiff to these areas each and every time.

58.     From the time Coworx acquired the Sony account in or about September, 2014, until the day that plaintiff resigned (in May, 2015) Coworx never sent a *single* other employee to recruit in "urban neighborhoods."  Plaintiff, Coworx's sole African-American employee, was sent each and every time.

59.     All of plaintiff's concerns about her safety and pleas for help to Coworx management fell on deaf ears.  Ms. Waring and Ms. Picciola were not interested in plaintiff's

concerns and actively ignored her complaints about her safety. Ms. Waring and Ms. Picciola did not take any of plaintiff's concerns or complaints with the "urban neighborhoods" seriously. While they listened the first two times she voiced concerns about her safety, each and every time thereafter they would ignore her and turn or walk away from her when she brought up the issue.

60.     If plaintiff brought the issue of her safety up during meetings with the entire Coworx staff, Ms. Picciola would interrupt plaintiff and say that she "didn't want to hear complaints from [her] team."

61.     Plaintiff often, at least once per week, implored Ms. Waring and Ms. Picciola to assign someone else to the "urban neighborhoods" or send a second person in order to increase plaintiff's safety.

62.     Coworx had approximately a dozen white account managers as qualified as plaintiff, socially outgoing like plaintiff, and with similar work and marketing experience. Ms. Waring and Ms. Picciola refused to send any of the white account managers to recruit in the "urban neighborhoods."

63.     Ms. Picciola repeatedly stated that these employees "need to stay to manage accounts from the office." Ms. Picciola gave no reason why these employees could not do what plaintiff did or why plaintiff should not be managing accounts from the office.

64.     Despite constantly complaining about her physical safety to Ms. Waring and Ms. Picciola, nothing ever changed; they continued to give plaintiff and *only* plaintiff the dangerous job assignment until she could not cope with it any longer and was forced to resign.

65.     Plaintiff's fellow account managers at Coworx (i.e., those similarly situated to her in rank, qualifications and experience) often remarked to plaintiff that they would resign if they had to recruit from the areas where Coworx sent plaintiff on a regular basis.

66.     For instance, account manager Jessica Abraham often remarked to plaintiff: "I couldn't do what you do, you're risking your life every time you recruit [from the "urban neighborhoods"]; those people are dangerous." Jessica would always conclude: "I would quit if I had to do that."

67.     Plaintiff often asked her fellow account managers, including Jessica, Peggy McDonald, and Ashlee Putala what they would do if they were in plaintiff's shoes. They always agreed that they would not be able to do what plaintiff did and would rather quit than risk their lives. They would remark: "it takes a lot of strength and courage to do what you do, Dondretta."

68.     On information and belief, almost all of plaintiff's life-threatening recruiting efforts were in vain. In fact, Ms. Picciola and Ms. Waring would rarely interview the predominantly black job applicants whom plaintiff recruited for the Sony account.

69.     Plaintiff would walk into the Bolingbrook office and see dozens of people whom she had recruited sitting in the lobby, neglected by the account managers. When plaintiff asked why Ms. Picciola and Ms. Waring were not processing these recruits' applications, Ms. Picciola and Ms. Waring would remark that they had "too many recruits to interview." But it was only or primarily plaintiff's African-American recruits whose interviews Coworx was avoiding.

70.     Nevertheless, Ms. Waring and Ms. Picciola *continued* to send plaintiff to recruit *more* people for the *same* positions on a regular, weekly basis. Plaintiff was extremely frustrated to see that, while she had to endure life-threatening situations two-to-three times a week to recruit qualified candidates for Sony, these recruits were never interviewed, let alone hired.

14

### *Ms. Picciola Prevents Plaintiff From Complaining to Higher Management*

71.     Ms. Picciola's policy for the Bolingbrook office was to handle employee complaints internally, without the involvement of "corporate personnel."  It was an unwritten rule that, if you complained to "corporate," Ms. Picciola would fire you.

72.     For example, Ms. Picciola would often threaten, "that's not the way we do things," and "don't ever go to corporate, we take care of our problems here."  She made it undeniably clear that she had no room on her staff for people who "snitched" to corporate.

73.     Nevertheless, plaintiff voiced concerns about her safety to a woman named Shelly, now deceased, who at the time worked for Coworx's corporate office in risk management.  On information and belief, Shelly never investigated the issue or worked to remedy the situation.

74.     Shelly was the only person whom plaintiff complained to at corporate.  Plaintiff feared she would lose her job if she complained to the corporate Human Resources department, as doing so would have violated Ms. Picciola's direct order to *never* involve corporate HR personnel.

75.     In the spring of 2015, the president of Coworx came to visit the Bolingbrook office.  He made his rounds and checked in with many of the employees, including plaintiff.

76.     However, Ms. Picciola made sure that plaintiff was not able to complain to the president about her physical safety.  When the president came to plaintiff's desk to speak to her, Ms. Picciola immediately came over to plaintiff's desk and motioned the president away by directing his attention elsewhere.  Ms. Picciola was successful and plaintiff was unable to alert Coworx's president about her ongoing concerns for her physical safety.

### *Coworx Forced Plaintiff to Resign*

77.     On or about May 4, 2015, plaintiff was forced to resign from Coworx. She had endured eight months of recruiting assignments that placed her in life-threatening situations.  She had been singled out due to her race to recruit in these areas.  All of her pleas for help and relief had been ignored by Coworx's all-white management.

78.     Plaintiff could no longer cope with the stress, anxiety and fear for her life and safety that she experienced two-to-three times each week.  She was exhausted from the never-ending struggle. Plaintiff had managed to stay alive, but she could take no more, and tendered her resignation letter on or about May 4, 2015.

79.     On information and belief, since plaintiff left Coworx, Coworx has *not once* sent any of its employees to recruit in the "urban neighborhoods."  The recruiting which Ms. Picciola and Ms. Waring had told plaintiff was "crucial" and "needed to get done" was not "crucial" enough to send white employees to get it done, especially after plaintiff left Coworx.

### *Coworx Damaged plaintiff*

80.     Coworx damaged plaintiff when it discriminated against her due to her race.  During the eight months that plaintiff was assigned to recruit from "urban neighborhoods," she experienced extreme anxiety, stress, emotional strain, and exhaustion.  She constantly feared for her physical safety and life.  The stress bled over into her personal relationships and strained her relationship with her husband, Sinatra Strong.

81.     Plaintiff, who never before had difficulty sleeping, began having nightmares and panic attacks that would interfere with her ability to sleep.  She went from getting 7-8 hours of sleep per night to 3-4 hours of sleep most nights between September, 2014 and May, 2015.

82.     Plaintiff's stress also manifested itself physically; her hair, which had always been thick, began falling out, and became especially thin on the top of her head. Plaintiff's hair stylist, Christine Dillingham of Serene Hair Design, 214 N. Bolingbrook Drive, Bolingbrook, noticed the prominent change in plaintiff's hair during the time plaintiff was assigned to the Sony account.

83.     Since being forced to resign from Coworx, plaintiff has been unable to obtain similar employment with another company, despite intensive efforts.  Plaintiff has sent and continues to send dozens of applications for work.

84.     Coworx required plaintiff to sign a non-compete agreement when it first hired her.  On nearly every job application, plaintiff must indicate that she is still restricted by the non-compete agreement.  When she does so, potential employers do not bother interviewing her, even though she has impeccable credentials.  On occasions where job applications do not require her to disclose the non-compete agreement, the issue comes up in the interview process, and, once it comes up, the interview is terminated, and plaintiff is sent home.

85.     Despite being extremely qualified, plaintiff has been unable to secure other employment due solely to her non-compete agreement with Coworx.

## COUNT I- DISPARATE TREATMENT UNDER TITLE VII AND SECTION 1981

86.      Plaintiff incorporates and re-alleges paragraphs 1-85 of this Complaint as paragraphs 1-85 of Count I.

87.     By taking the actions described above, defendant discriminated against plaintiff by treating her less favorably because of her race, in violation of Title VII and Section 1981.

WHEREFORE, plaintiff seeks an award of damages from defendant for

    a.     compensatory damages, including but not limited to damages for emotional pain and suffering;

    b.     punitive damages;

    c.     prejudgment interest;

    d.     post-judgment interest;

    e.     equitable remedies, including reinstatement;

    f.     costs;

    g.     reasonable attorneys' fees and expenses; and

    h.     such other relief as the Court may find appropriate.

## COUNT II- CONSTRUCTIVE DISCHARGE UNDER TITLE VII AND SECTION 1981

88.     Plaintiff incorporates and re-alleges paragraphs 1-87 of this Complaint as paragraphs 1-87 of Count II.

89.     By taking the actions described above, defendants constructively discharged plaintiff due to her race, in violation of Title VII and Section 1981.

WHEREFORE, plaintiff seeks an award of damages from defendants for

    a.     lost wages;

    b.     front pay;

    c.     compensatory damages, including but not limited to damages for emotional pain and suffering;

    d.     punitive damages;

    e.     prejudgment interest;

    f.     post-judgment interest;

    g.     equitable remedies, including reinstatement;

h.      costs;

i.      reasonable attorneys' fees and expenses; and

j.      such other relief as the Court may find appropriate.


Respectfully submitted,


/s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
And the Social Justice Project, Inc.,
1525 East 53rd Street, Suite 832
Chicago, Illinois  60615
(773) 241-5844
(773) 241-5845 (FAX)


## JURY DEMAND

Plaintiff demands trial by jury.


/s/Al Hofeld, Jr.
Al Hofeld, Jr.


## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


/s/Al Hofeld, Jr.
Al Hofeld, Jr.

19